May it please the court, my name is Maya Golden-Krasner on behalf of petitioners. I'd like to reserve three minutes for rebuttal. We are all here today because the government has fallen down on its job of making sure the most polluted regions in the country attain the Clean Air Act standards. It's as if they've given up. They've decided, hey, we can see the mountains now, and that's good enough. Except that under the Clean Air Act, that's not good enough. The Clean Air Act requires EPA to develop clean air standards necessary to protect public health. The act then requires states to develop state implementation plans, SIPs, which are roadmaps that provide the exact route showing how and that the region will attain the standards by the deadline in the act. The issue in this case is that EPA approved a SIP that does not and cannot demonstrate attainment of the PM 2.5 Clean Air Standards in the South Coast for two reasons. First, as a roadmap, a SIP must contain enforceable, which means unambiguous and measurable requirements that detail exactly how the state will get to attainment of the standard. Here, the South Coast has part of a map with specific measures like wood-burning fireplaces. EPA points to these types of measures throughout its briefs. What's the standard of review? The standard of review? Mm-hmm. So they, so EPA does receive deference, but they need to provide a rational connection between the facts and the choice that they made. So we have to, we owe the agency deference in making these determinations, right? There is some deference, but there is not deference when there's no connection between, or even a rational connection between the facts and the decision that EPA made. That's not the standard of review. That's the applicable, that's an application of the standard. The standard of review is deference, and we then determine whether or not the requirements of deference is met, right? Right. So here, the EPA does not deserve deference in the decision that they made because they have not created a plan that complies with the standards of the Act. They cannot, they're not free to not comply. And we don't defer to them on that point? No. Whether something is, in fact, sufficiently enforceable to create a, or sufficiently clear in order to create an enforceable standard? Why isn't that the kind of thing that it, the agency, in its expertise, you know, they've done a lot of this stuff. Why don't they get deference on that point, too? So is the question I mean, they may be wrong, even with deference, but I'm wondering why is that not something we, as to which we defer? So is the question, do we defer if they say that something is enforceable? Well, the question is what I asked the question to be. Okay, but I need clarification on the question. Okay, what? So is the question that if they say that something is enforceable, then it's enforceable, and we should give deference for that? Well, you've already said that they entitled deference, but yes, don't they get, you were going to the subparts of what is enforceable. You say it's not enforceable because it's not sufficiently precise. I mean, those are components of enforceability, right? Yes? Right. And so I was asking you, don't they get deference as to those things as well, on the question of whether something is sufficiently precise, sufficiently specific, sufficiently concrete? In order to be enforceable, isn't that a question of judgment as well, as to which they get deference? Well, EPA is contradicting its own previous definition of what is enforceable. You're not answering my question. Okay. The question is not what are they doing in this case. I'm asking is, are they entitled to deference on those subcomponents of? Well, they're not entitled to deference just because they say that something is entitled to, I mean, is enforceable. Well, I'm asking the generic question, not whether they are entitled in this case. You might argue that in this case they should be denied, they should be reversed even with deference. But on the generic question of whether something is sufficiently enforceable and its component parts, the things that make it up, is it specific enough, is it concrete enough? Okay. Doesn't the agency get deference in making that determination? Yes, the agency can have deference. Okay. So that's the land we're in. We're in the land of deference, and now you're going to try to show that they shouldn't get deference because it's an abuse of discretion? Exactly. It's an abuse of discretion. Thank you. Okay. So why is it an abuse of discretion? So the problem is that while the agency's points are all these measures that are capable of producing pollution, there's still this gap, and what this gap is is a promise, and that's the promise. That promise, the gap is they have made a commitment to reduce the total tonnage. I'm sorry, they. It's sort of indefinite. You sort of point in the general direction of they. So the government, the state approved by EPA has made a commitment that they will achieve the total reductions necessary to attain the standard in the act. Right. And the agency has said. And they say, so it's enforceable. Good enough. We think that's sufficiently enforceable. Right. And our argument is that it's not enforceable for several reasons. First, we don't believe that these commitments are even allowed in the Clean Air Act. So, for example, Congress has provided places in the Clean Air Act where they will allow commitments. So Congress contemplated there are some instances where in a pinch, agencies might need to rely on commitments. So, for example, in Section 110K, they allow for enforceable commitments that are adopted within one year. In Section 1.2, for extreme nonattainment ozone regions, they allow for. Okay. What you're talking about here is an interpretation of the statute. Right. And what you're saying is, if I understand correctly, is because Congress listed certain things as where commitments were permissible, the statute should not or cannot be construed as including other kinds of commitments. That is a statute. And the question is, why doesn't the agency get Chevron deference, the most extreme kind of deference there, because they are interpreting the language of its own governing statute. But the agency is not free to contradict the plain language of the statute. Well, the statute does not say there shall be no other commitments. It simply lists certain commitments, certain things that are permissible. And one inference you can draw from that is, you know, from law school, remember? You know, two possible inferences. Well, I remember law school, so you must. You've grown much more recent than I have. You know, you know, there's some profanity here. One inference is it's in the statute, and therefore it means nothing else is permissible. The other inference is it's in the statute, but that's sort of non-exclusive listing, and you could infer that other things are permissible as well. And if that's where we are, doesn't the agency get to decide which of those two possible interpretations is correct? Well, I believe that where we are is that what this case found in AIR v. EPA 686F3668, which is that it's a standard principle of statutory construction that when Congress includes language in one place in the statute but excludes it in the other, it's presumed that Congress acted intentionally in the inclusion or the exclusion. I think that's even in Justice Scalia's book of maximums, Inclusio Unius Exclusio Aeterius or something like that. It's not often that I quote Scalia. I'm sorry? I said it's not often that I would quote Scalia, so there you go. There we go. I was giving you a freebie. Exactly. So even if this Court, though, agrees, believes that the statute is silent and therefore EPA deserves deference, and so this Court then follows the Second and Fifth Circuit in saying that these commitments are allowable, they can't be allowed here because these are unenforceable goals, not control strategies, and because the tonnage commitment that EPA estimates that they need to achieve to achieve the standard is too much reductions and too short of an amount of time. So the heart of the SIPP, as I said earlier, is two things. It's enforceable strategies with clear, unambiguous, measurable requirements, and it's the attainment demonstration that shows that these requirements will attain the standard, and a promise to attain enough reductions to comply with the Act eviscerates the first basic requirement of the SIPP, that it act as a roadmap to attainment. So without this map, the SIPP can't get to attainment. So EPA insists that the commitments are a control strategy to address the resulting emissions reduction gap. A commitment to achieve reductions is separate, however, from an enforcement strategy to get there. So the Clean Air Act regulations provide clear definitions and examples of a control strategy defined as a combination of measures designated to achieve the aggregate reduction of emissions necessary for attainment. In other words, it does not mean the promise to make the aggregate reduction. It means the actual measurable requirements to get there, such as emissions limitations. So the problem here is that we don't have a control strategy, we have an unenforceable goal. EPA says that for a SIPP regulation to be enforceable, it must clearly spell out which source or source types are subject to requirements, what the requirements are, and have a way to verify the emissions reductions that are occurring, such as record keeping or monitoring. And this court has not allowed us to do what's happening here, which is to promise to comply with the Act, and nor does it allow us to enforce SIPP goals. So without an underlying strategy to achieve the total tonnage commitment, such as in Bayview-Hunters Point, an enforceable requirement to monitor ridership gains through annual reports, in order to achieve the unenforceable goal in that case of a 15% increase in ridership, all you have is an unenforceable goal. So, in fact, EPA's even found a very similar case to be an unenforceable goal in its own testament. Why is it unenforceable? If the goal is not achieved, why couldn't there be a lawsuit seeking to enforce it? Well, because in this case, all they're doing is promising to comply with the Clean Air Act, right? So the standards of the Clean Air Act. So there would be no purpose to have a SIPP, for example, in this case. EPA did not create a system where they said, here are the standards, states promise to achieve them, and they say, on my honor, I promise to achieve them, and then that's how it works. Instead, Congress created a system that said, EPA set the standards, and states, you figure out how you are going to get there, and we're not going to wait until the deadline passes to figure out whether you got there or not. We have a system of checks and balances where the SIPP sets up enforceable specific measures, and EPA and communities can make sure that they are implementing those measures along the line to make sure that we actually attain that standard. And on top of that, if we wait to see if they made the reductions until after they attain the standard, then at that point, they're just going to be creating the requirement as EPA says, okay, you need to now, you haven't attained, you need to revise and make a new plan. Okay. Did you want to reserve time for rebuttal? Yes. Thank you. Okay. All right. We'll hear from the other side. Are you splitting time? I guess we would like to give three minutes of our time to you. Okay. Just keep an eye on the clock. Okay. Your Honor, may it please the Court, my name is Heather Ganji. I'm here on behalf of the U.S. Environmental Protection Agency. At the outset, I'd like to just address the initial question that the Court posed. With respect to the construction of statutory provisions and regulations, EPA should receive Chevron deference. But with respect to the application of particular facts to those constructions, the standard is arbitrary and capricious. Okay. I'm not sure which is better for you, you know. Well, we think we prevail under both, but we'll decide. So as a threshold matter, EPA has construed Section 7410A2A of the Clean Air Act and Section 7502C6 for at least 20 years to allow it to approve enforceable commitments as part of SIPs, to close the emission reduction gaps. I don't think they're disputing that. I think they, if I understand the argument on their side correctly, is they're saying, yes, if it's in fact an enforceable commitment, then I think they're not disputing this permissible. I think what they're disputing is whether or not it's an enforceable commitment. And EPA believes that both the control measure commitments and the overlapping tonnage commitments are fully enforceable. So how do you distinguish Bayview-Hunter's point? There, there was a general reduction guideline, similar in some respects to this case. Now, I agree with you in that case. I dissented, but I was outvoted. And that's law of the circuit. So how do you distinguish that case? We distinguish this here because both the Air District for the South Coast and the California Air Resources Board each separately committed to first take action on a specific list of control measures that were clearly identified in the SIPs signals by specific dates. And that is itself an independent set of fully enforceable commitments if either the Air District or the Air Resources Board missed any one of those deadlines, which all have passed, by the way. All of those deadlines have passed. Then it's EPA's position that either petitioners through a citizen suit or EPA through Section 113 or 179 of the Clean Air Act could take enforcement action. Explain to me the mechanics of that, because that was the argument in Bayview-Hunter's point. And we said, no, that's not, you can't enforce it. So we were at that juncture in that case. So explain to me the mechanics of how EPA or the plaintiffs through a citizen suit could enforce it in this case. And I should clarify, for each of those agencies, there are two separate sets of commitments. There are the control measure commitments I just described, and separately. And within the text of the Code of Federal Regulations, the agencies did not simply commit to comply with the Clean Air Act requirements. They specifically committed to achieve specific tons of reductions of specified pollutants by 2014. So mechanically, if one wanted to enforce the control measure commitments, which raised the Bayview question, all they need to do is watch the public record docket of either the Air District or the Air Resources Board, which has to approve and then implement and then submit those measures to EPA through a public process. They have to be amended into the SIP, and under Section 114L of the Clean Air Act, the state can only do that by undergoing a public notice and public hearing process to actually finally adopt those measures. And then they have to formally request that EPA actually adopt them into the SIP. So simply watching the docket of those agencies will tell you whether or not the agencies are taking the action that's required under the control measure commitments. Well, the problem in Bayview, in a sense, was that because of the general attainment, they said that's too amorphous. So tell me exactly what the injunction would say that the district court would issue. For the control measure commitments, the injunction that would issue would be a requirement that the state agency, whether it's the Air District or the Air Resources Board, that missed a specific measure by a specific date. The order would be for the pertinent agency to actually take the required action on the specified control measure by a date that the court then would have to select. So basically that differs from Bayview in what respect? It differs significantly because the commitment is to take action. In the case of the Air District, it's to actually approve and submit to EPA. A particular list of control measures that are identified by number and by substance with an actual year's date there. And they either adopted and submitted them to EPA by those dates, which have passed, or they didn't. And if the deadline day for taking that action passes, the next day the petitioners can issue a notice of intent letter and 60 days thereafter file suit in the district court. But again, just to make sure that we're talking about the same thing, the injunction would be as to aggregate amounts and not as to specific sources? There are two separate but overlapping sets of commitments, and I think that may be where petitioners' confusion comes in. With respect to the tonnage commitments, which specify pollutants and a specific number of tons, if at, well, there are two different points where they take enforcement action, and I can address this. Let's take the tonnage requirement because I think I understand the other one. Okay. There are several different points where they could enforce the tonnage commitments. Again, adopting the control measures that would achieve by January 2014, a date that's passed, those specific reductions, they simply need to watch the public docket for either the Air District or the Air Resources Board, look to the measures that are adopted, and in those measures, the agencies specify the amount of reductions they believe they'll achieve and over what time frame, and simply watch to see whether before the end of 2013, the Air Resources Board and the Air District actually adopted and implemented enough measures to achieve those tons of reductions. If they did not at that point, which has passed, then petitioners already could be in the district court seeking an injunction instructing the relevant agency, whether it's the Air District or the Air Resources Board, to achieve that last delta, whatever that last bit of reductions is that's left by a date certain. If the agencies represented that they thought they would get enough reductions, then they simply need to watch the public docket of the Environmental Protection Agency because EPA has to adopt each one of those control measures into the SIP as a SIP amendment and determine independently, by the way, they don't simply take the state's word for it. They do an independent assessment of what level of reductions is actually achieved and publish that. Those are public notice and comment rulemakings. And when EPA is done adopting those measures into the SIP, you do an addition problem. Either the emission reductions that EPA has signed add up to the numbers in the language in the Code of Federal Regulations, or they don't. And if the number that they add up to is smaller than the number in the Code of Federal Regulations, then that day petitioners can issue a notice of intent letter under the citizenship provision and 60 days later file a complaint in district court. And EPA could also take enforcement action either under Section 113 or Section 179 of the Clean Air Act. I thought their argument was that this merely, or at least what I heard was, that this merely commits them to comply with the statute. It doesn't really provide a specific mechanism for them to have the reductions. And that's what needs to be enforceable. I think there are two parts to that answer. The first one is that if you read the text of the Code of Federal Regulations, it commits those state agencies to achieve a very specific number of tons of emission reductions, very particular. I mean, I can tell you right now for the Air Resources Board, they committed to reduce 2.9 tons per day of particulate matter, 2.9 tons per day of sulfur oxides, 10.4 tons per day of volatile organic carbons, and 10.8 tons per day of nitrous oxides. And the Air District committed to reduce 6.1 tons of particulate matter, 38.1 tons of sulfur oxides, 33.6 tons of volatile organic carbons, and 118.2 tons of nitrous oxides. Those specific numbers are codified in the Code of Federal Regulations provisions. There's no uncertainty there. There's no flexibility either. Those are Federal law. Those numbers cannot be changed unless the state goes through notice and hearing rulemaking. No, I understand that, but I thought the argument was numbers, the goals may be specific, but the goals don't add anything to what is their obligation. What you need is a mechanism. You need to say we're going to achieve this by doing X, by reducing the number of miles driven, you know, by putting in more, you know, something specific like that, so that you can actually go to court and say they didn't, they said they'd lay tax, they didn't lay tax. And that is in there, Your Honor, and it was explained in significant detail in the final rule and the technical support document and the proposed rule as well. The control measure commitments and the tonnage commitments are separate and enforceable, but they also overlap. And EPA has consistently said that the control measure commitments are, in fact, a strategy to achieve the emission reductions that are specified in the tonnage commitments. So the control measure commitments are a road map. They are a path. And under Section 7410A2A, there are also means and techniques and a schedule and timetable for achieving those reductions. But EPA also said very particularly that those control measure commitments can actually be enforced. And are those specific enough to be enforced? Yes. Those control measure commitments can actually be enforced. Petitioners could be in district court today if they could identify any one thing. Not today. They're here. Well, within 60 days. They need to do it at lunch for a notice of intent. I mean, we do take priority, you know. Okay. Sure. My apologies. Well, what could they do? I mean, let's say, give me a poor example as to what they could now seek enforcement in district court. Assuming it were, I'm not saying concede that it's a violation, but let's say there were a violation. What would be the kind of thing they could actually do? If they looked at the docket for the Air District or the Air Resources Board and they compared the numbers on the list of control measures, they were identified by number, and said, well, oh, the Air District was supposed to, you know, approve and propose to EPA measure 7501. And they looked at the public docket for the Air District and found that, say, this mythical measure 7501 had not been approved and proposed to EPA by the specified deadline. They could, as soon as they saw that on their computer, issue a notice of intent letter under the citizenship provision, which would give them a 60-day waiting period, and then they could file their complaint, saying, we would like an injunction ordering them to approve measure 7501 by X date and submit it to EPA. You're down to two minutes or so. And I believe, if you want to submit any more questions, otherwise I had hoped to give some time to intervene. Okay. Thank you very much. Good morning. May it please the Court, I'm Barbara Baird, Chief Deputy Counsel for South Coast AQMD, and I'm also representing Southern California Association of Governments. I'd like to just respond to what I thought was a question that sought the distinction between the Bayview case and this case. And I note that in Bayview, the Court did hold enforceable the specific steps which the agencies committed to comply with. The Court, however, said that the 15 percent goal was not enforceable, because that was written into the SIP as an agreement to establish a target in the future. And the Court felt that that was distinct and unenforceable as opposed to the specific steps to increase the productivity of the transit rider system, which the Court said was enforceable. And in our case, we do have very specific steps that are set forth in tables in EPA's approvals where they list the measures that each agency has committed. I understand that part. What troubles me is the overall tonnage reduction. How would they enforce that? Well, I guess. We want to enjoin your district to comply or direct the district to comply with the overall tonnage requirement. How would you respond to that kind of suit? My guess is you'd say, Bayview, it's not enforceable. I understand your question correctly. You're probably worried that if the tonnage target is not specifically tied to an individual measure, let's say 2 tons for the restaurant rule, then if we adopt the restaurant rule and only get 1 ton, then the plaintiffs wouldn't be able to sue. But recall that EPA has a three-step test for approving commitments as part of their SIP approval. One of those tests is that it be a limited amount. Another is that it be for a reasonable period of time. In this case, at the time of approval, there were only 2 years remaining before the attainment date for us and the Air Resources Board to adopt all our measures. Since it takes some time for the measures to go into effect after they're adopted, the petitioners could follow the exact process that Ms. Gange was describing, watching the rulemaking adoption calendars of each agency. If they had not adopted sufficient measures to get all the tons by the middle of last summer, if not earlier, they would have known that there was not time left to make those commitments, and they could have soon sued to get what was remaining. And I want to point out that the argument that the agencies have fallen down on the job and given up just isn't really correct. The data we've submitted to EPA shows that we actually attained this particular standard as of the years 2011 through 2013. So the SIP was working and has worked. Okay, thank you. You have a little time for rebuttal. So there are a couple points I want to address in rebuttal. First, as they did in the briefs, EPA and the district are conflating the control measures and specific rules that they list out in all of their charts in the technical support document with the emissions gap. Those rules have already been, the reductions associated with those rules have already been credited into the SIP. That 70 tons per day NOx is what's left over. So, for example, they say in ER, petitioner's ER 24, CARB emission reductions commitment is to achieve the total emissions reductions necessary to attain the federal standards. And they say they can do this a number of ways, the implementation of control measures, the expenditure of local incentive funds or other measures. In this case, they went from 129 tons per day to requiring 70 tons NOx per day, partly because there was a change in the baseline because of a recession, which potentially is over now. So they say this over and over. We commit to this total tonnage. The listed measures that they point to have reductions. They are credited in the SIP. And what we're talking about is what's left over. And the table four on petitioner's ER 24 shows this. In terms of, this is also comparable to, in terms of the fact that they could point to rule 501, for example, and say, oh, they were supposed to do this on a specific date, and it would have this many reductions, and so, therefore, we can enforce it. That doesn't happen here. So, for example, if you look at the final rule approval for environmental defense, they talk about the six specific rules that they are committing to adopt to by specific dates. That's well ahead of the attainment deadline. Or even in the Texas case, where ultimately they failed to attain the standard, the final rule went through an analysis of each of the proposed measures and how many reductions that they believed each would get. And finally, I want to end by also saying that this plan cannot demonstrate attainment because it's not protecting the over 1 million people who live within 300 meters of the freeways that cross Southern California in our unique Los Angeles area. And EPA has even recently found that that's required. Thank you. Thank you. The case just now was submitted. This was actually the second case on the calendar, number 12-7079. That is a
judges: Kozinski, Thomas, Gould